MARC E. MAYER (SBN 190969)
  mem@msk.com
MARK C. HUMPHREY (SBN 291718)
  mxh@msk.com
HANNAH G. SHEPHERD (SBN 347611)
  hannah.shepherd@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiff
Activision Publishing, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>JULIAN ANGEL VALENZUELA a/k/a "Wolfy," an individual; A.R. a/k/a "Noziex," a minor; and DOES 1-10, inclusive,<br><br>    Defendant. | CASE NO. 2:26-cv-1286<br><br>**COMPLAINT FOR:**<br><br>**(1) TRAFFICKING IN CIRCUMVENTION DEVICES [17 U.S.C. § 1201]**<br><br>**(2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT [18 U.S.C. § 1030]**<br><br>**(3) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**(4) UNFAIR COMPETITION**<br><br>**Demand For Jury Trial** |

Activision Publishing, Inc. ("Activision" or "Plaintiff") alleges as follows:

## **PRELIMINARY STATEMENT**

1.      Activision owns and publishes the massively popular *Call of Duty* series of video games, including the games *Call of Duty: Modern Warfare III, Call of Duty: Black Ops Cold War, Call of Duty: Black Ops 6,* and *Call of Duty: Warzone* (the "COD Games").  By this action, Activision seeks to put a stop to the unauthorized development, distribution, and sale by Defendants of software products designed to disrupt, alter, or impair the functioning of the COD Games and their multiplayer servers.  These software products, which include those known as "Zenith" and "Devware" (the "COD Hacks"), allow malicious players to disconnect (or "boot") players from multiplayer servers, as well as to give them competitive advantages over legitimate players, such as automatic aiming; the ability to locate opponents through walls or other obstacles; and the ability to immediately gain access to (or "unlock") restricted in-game content (which normally would need to be earned in the game).  Additionally, the COD Hacks include or incorporate tools that are specifically created and designed to prevent or impair the enforcement of Activision's anti-cheat technology.  The COD Hacks impair and damage Activision's COD Games, its business, and the experience of the COD player community.

2.      Defendants Julian Angel Valenzuela and A.R. (known most prominently online as "Wolfy" and "Noziex," respectively) are the owners and primary developers of the COD Hack known as "Zenith" (the "Zenith Hack").  As of September 2025, Defendants had sold almost 28,394 licenses to the Zenith Hack, largely through dozens of "resellers" – *i.e.*, individuals who sell the COD Hacks and other malicious software via online storefronts.

3.      Defendant Valenzuela is an experienced and sophisticated computer hacker who for years has been engaged in the business of developing and

1  distributing software designed to disrupt the *Call of Duty* online experience.

2  Valenzuela first created and, with A.R. released, a software product called

3  "Devware" (which later became known as "Stealth") (the "Devware Hack") in

4  early 2024 (if not earlier).  In April 2024, when Activision became aware of

5  Devware's growing popularity, it sent multiple cease and desist letters to

6  Valenzuela and A.R.  In June 2024, Valenzuela pretended to comply with

7  Activision's demands and posted a message online that he had "ceased all

8  development and sales related to "Any Activision Products" and "The Call of Duty

9  series of video games, including but not limited to Call of Duty: Modern Warfare

10  and Call of Duty: Warzone."

11      4.    Valenzuela's statements were false; in fact, he never intended to cease

12  his conduct.  Within weeks of Valenzuela's June 2024 post, he developed and

13  released (also with A.R.) a new software product known as "Zenith" (the "Zenith

14  Hack").  By mid-2025, thousands of people had downloaded and used the Zenith

15  software product.  These numbers continue to grow exponentially, in part because

16  the Zenith Hack is among the last known "rage" cheats on the market.  The Zenith

17  Hack also generated significant publicity due to its recent "successful" execution

18  of a "Crash Server" exploit, which took down five of Activision's dedicated *Call*

19  *of Duty* servers in May 2025.  Valenzuela has continued his conduct unabated

20  since then; indeed, as recently as January 14, 2026, Valenzuela added additional

21  crash features to Zenith's cheat offerings, causing further and ongoing damage to

22  Activision.

23      5.    In an effort to resolve this matter without litigation, Activision again

24  contacted each of the Defendants to demand that they immediately stop

25  developing, marketing, and distributing any COD Hacks, including the Zenith

26  Hack.  Defendants not only ignored these demands, but Valenzuela continued to

27  actively promote the Zenith Hack, and has posted a continuous stream of online

28  posts touting updates and improvements he has been making to the Zenith Hack.

Mitchell
Silberberg &
Knupp LLP

21237906.5

3
**COMPLAINT**

6.     Defendants know that their conduct is unlawful and they engage in that conduct with the deliberate intent to harm Activision, its businesses, and its COD player community.  Activision has given Defendants multiple opportunities to comply with Activision's demands -- only to be met with stonewalling, silence, and at times outright defiance.  Accordingly, Activision asks this Court to put a stop to Defendants' misconduct once and for all, and respectfully submits that it is entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants arising from their willful and malicious conduct.

## JURISDICTION AND VENUE

7.     This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. § 1201, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the laws of the State of California.

8.     This Court has subject matter jurisdiction over Activision's DMCA Anti-Circumvention claims and Computer Fraud and Abuse Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Activision's state law claims for intentional interference with contract and unfair competition, which are so related to Activision's federal claims as to be part of the same case or controversy.

9.     This Court has personal jurisdiction over each of the Defendants, because each has agreed to Activision's Terms of Use, pursuant to which Defendants voluntarily consented to personal jurisdiction and venue in Los Angeles, California.  Activision's Terms of Use, including its venue and jurisdictional provisions, is a valid, binding and enforceable agreement.

10.    Additionally, each of the defendants have purposefully directed their activities at the State of California, have purposefully availed themselves of the benefits of doing business in California, and have established a continued presence

in California.  Specifically, Activision is informed and believes, and on that basis alleges, that, without limitation:

a)  The COD Hacks have only one purpose: to harm video games developed and published by Activision in the State of California, with the goal of obtaining substantial (and unlawful) monetary gain for Defendants.  The COD Hacks specifically were developed and designed to target Activision and its products, to devalue the massive investment Activision has made in the COD Games, and to degrade the work of developers, programmers, artists, game designers, software engineers, online security experts, and others who worked on the COD Games.  Indeed, the COD Hacks are parasitic in nature, in that they derive value only from Activision's COD Games, and their very existence relies on Activision's continued support for its COD Games, which were created in California and published by a California company.

b)  Defendants engage in extensive and ongoing business with users in the State of California.  Defendants distribute the COD Hacks in the State of California, advertise and market the COD Hacks in the State of California, and communicate directly with users of the COD Hacks in California.

c)  Defendants target the COD Hacks to users in the State of California, knowing that a substantial market exists for their COD Hacks in the United States and in California.  Additionally, while Defendants have the ability to limit or restrict the use of the COD Hacks by individuals in the State of California, they deliberately have refused to do so.

d)  Defendants have entered into, and continue to enter into, contracts with individuals in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the COD Hacks.  In return for such licenses, Defendants receive payments from individuals in the State of California.

1      e)  Defendants engage in conduct that they know is likely to cause harm
2  to Activision in the State of California, including in this District, where Activision
3  is located and has its principal place of business.

4      11.    Defendants consented to the exclusive venue of this Court when they
5  agreed to the TOU.  Additionally, venue is proper in this District pursuant to 28
6  U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the
7  events giving rise to the claims occurred, and/or in which Activision's injuries
8  were suffered.

9  **THE PARTIES**

10      12.    Activision is a corporation duly organized and existing under the laws
11  of the State of Delaware, with its principal place of business in Santa Monica,
12  California.  Activision is among the world's leading developers and publishers of
13  video games, and is the owner of valid and registered copyrights in each of the
14  COD Games.

15      13.    Activision is informed and believes, and on that basis alleges, that
16  Defendant Julian Angel Valenzuela a/k/a "Wolfy" is an individual who resides in
17  Midland, Texas.  Activision is further informed and believes, and on that basis
18  alleges, that Valenzuela has used the online aliases Wolfy1337, WolfyDW, Meep,
19  and Fad.  On information and belief, Valenzuela is the primary developer of the
20  Zenith and Devware Hacks, the driving force behind the Zenith and Devware
21  Hacks, and is the person responsible for overseeing the marketing, distribution, and
22  sale of the COD Hacks.

23      14.    Activision is informed and believes, and on that basis alleges, that
24  Defendant A.R. a/k/a Noziex is an individual who resides in Boynton Beach,
25  Florida.  Activision is further informed and believes, and on that basis alleges, that
26  A.R. also has used the online aliases Bytel and Brother Bytel.  On information and
27  belief, A.R. is Valenzuela's informal business partner and is actively and centrally
28  involved in the distribution of the Zenith and Devware COD Hacks.  A.R. also was

Mitchell
Silberberg &
Knupp LLP
21237906.5

**COMPLAINT**

the owner of a since-shuttered website known as "Medieval Cheats," as well as a website called "Aparta Bytes," through which he sold and distributed thousands or tens of thousands of copies of the COD Hacks.  Activision is further informed and believes, and on that basis alleges, that A.R. is involved and has actively participated in developing cheats designed to be used with the COD Games.

15.    Activision is informed and believes, and on that basis alleges, that Defendant Doe 1 a /k/a CesarRodregaz is an individual whose location is currently unknown.  On information and belief, Doe 1 is a "reseller" of COD cheating and hacking software and is engaged in the business of marketing, selling, and distributing such software, including the Zenith Hack, via the service known as "FullSendGaming," located at the URLs https://t.me/fullsendservices; https://t.me/fullsendgamingservices; https://fullsendgaming.sellauth.com; https://fullsendgamingstore.mysellauth.com/; and https://fullsendgaming.org (collectively, the "FullSend Gaming Websites")

16.    Activision is informed and believes, and on that basis alleges, that Defendant Does 2 through 10 are individuals whose identities have not yet been confirmed by Activision.  The Doe Defendants include developers, resellers, technical support staff, and other individuals who have participated in the development, sale, and distribution of the COD Hacks.

17.    The true names and capacities, whether individual, corporate, associate, or otherwise, of the Doe Defendants, are unknown to Activision, which therefore has sued said Defendants by such aliases and fictitious names.  Activision will seek leave to amend this complaint to state their true names and capacities once said Defendants' identities and capacities are ascertained.

18.    Activision is informed and believes, and on that basis alleges, that all Defendants sued herein are liable to Activision as a result of their participation in all or some of the acts set forth in this Complaint.  (All of the aforementioned

1   Defendants, both the named Defendants and the Doe Defendants, are referred to

2   herein collectively as "Defendants").

3     19. Activision is informed and believes, and on that basis alleges, that at

4   all times mentioned in this Complaint, each of the Defendants was the agent of

5   each of the other Defendants and, in doing the things alleged in this Complaint,

6   was acting within the course and scope of such agency.

7

8   <u>**FACTS APPLICABLE TO ALL CLAIMS**</u>

9   <u>**Activision's Intellectual Property Rights and the COD Games**</u>

10     20. Activision is among the world's leading developers and publishers of

11   video games, including many of the most popular games ever released to the

12   public.  Activision is the publisher and owner of all rights, title, and interest in the

13   copyrights in the COD Games, which consist of more than 18 video games

14   released since 2003 on various video game platforms.  The COD Games are

15   consistently among the best-selling games in a given year, having sold hundreds of

16   millions of copies to date.

17     21. Activision's copyrights in the COD Games include, without

18   limitation, rights in and to the COD Games' computer software and the audiovisual

19   works and screen displays that are created when the COD Game software interacts

20   with a user's computer.  Activision's copyrights in the COD Games also include

21   the dynamic non-literal elements created when the COD Games' software interacts

22   with the COD Games' online multiplayer game servers.  *See MDY Indus. v.*

23   *Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010).  Activision possesses

24   valid, registered copyrights in each of the COD Games.

25     22. The COD Games are "first-person shooter" video games that allow

26   players to step into the shoes of soldiers and elite operators in combat throughout

27   history, ranging from World War II to modern day and into the future.  All of the

28   COD Games include competitive multiplayer modes, where players join online to

play together in real-time.  Each of the COD Games offers as many as a dozen or more different online multiplayer game types.  The online multiplayer experience is extremely intense, as players compete to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives.

23.    Activision works very hard to ensure that the COD Games offer consistently compelling player experiences so that customers will remain engaged in the COD Games, continue to play them for sustained periods of time, and be excited about future releases.  If players perceive that a game is unfair or that the multiplayer experience is not working properly, including because others are cheating or disrupting and/or hacking multiplayer servers, players may grow frustrated with the COD Games, become less interested in playing and supporting them (including by purchasing new games and items) and may even stop playing entirely.  Cheating and hacking therefore not only harms (and could even destroy) COD player communities, but also impacts Activision's ability to offer the fast-paced, stable, high-quality online gameplay millions of fans have come to expect from Activision and the COD Games.

### Activision's Efforts To Protect Against Hackers And Cheaters

24.    Because the COD Games are so popular, unscrupulous individuals such as Defendants seek to exploit the games for their own personal gain and profit by selling cheats, hacks, and other malicious software.  Such individuals do so knowing that they are ruining the experience for other players and harming Activision.  For this reason, Activision undertakes significant efforts to protect the integrity of the COD Games through both technical and contractual means.

### Technical Protection

25.    One way that Activision seeks to protect the COD Games from cheating or unauthorized exploitation is by developing and employing anti-cheat and other online security technologies.  These technologies help detect when

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP
21237906.5

1    players are using third party cheating or hacking software, and prevent

2    unauthorized access to the COD Games by those players. It is not possible to play

3    the COD Games' online multiplayer modes without installing Activision's anti-

4    cheat technologies.

5        26.    When Activision identifies or detects that a player is using cheating

6    software or other hacks in one of the COD Games, the player's account may be

7    suspended or "banned," such that the player is restricted from accessing the game

8    and its remote server.  In some circumstances, such as when a player receives

9    repeated suspensions or bans using multiple accounts, Activision may impose a

10   "hardware" ban based on unique identifiers from specific components of a player's

11   PC, such as their CPU, GPU, motherboard, or other hardware (known as hardware

12   ID or "HWID"). When a player's account has been subject to a hardware ban,

13   Activision employs technology that effectively prevents the player from accessing

14   Activision's servers (and therefore playing the COD Games) using the hardware

15   that is subject to the ban.  Hardware bans are among the most stringent measures

16   Activision has at its disposal to combat the use of cheats, hacks, and other

17   malicious exploits.

18       27.    In order for any hack or cheat software to operate, it must be designed

19   to prevent or avoid detection by Activision's anti-cheat software, such as by

20   concealing itself or by disabling the anti-cheat technology.  Otherwise, the

21   software will be detected and the user will be denied access to the particular

22   game's online multiplayer functionality, and may even be permanently banned

23   from playing the game.

24                          Contractual Protection

25       28.    In order to access or play the COD Games, users must create and

26   register accounts with Activision.  After installation and upon first playing the

27   COD Games, users must expressly assent to Activision's Terms of Use

28   (collectively, the "TOU") by clicking through them.  If the user refuses to consent

1  to the TOU, they cannot proceed and play the game.  After agreeing to the TOU

2  (and other agreements), users are prompted to create an Activision account (or log

3  into an existing account), and cannot proceed to play the COD Games until they do

4  so.

5       29.    The TOU includes a limited license agreement between Activision

6  and its users.  Under the TOU, Activision grants to users a "personal, limited, non-

7  exclusive license" to use its games for "non-commercial use," expressly

8  conditioned upon the user's compliance with the TOU.  Among other provisions,

9  by assenting to the TOU, users expressly agree not to "use, develop, host or

10  distribute cheats, automation software (bots), modded lobbies, hacks, mods or any

11  other unauthorized third-party software" in connection with Activision's games "or

12  engage in any form of cheating, boosting, or booting[.]"

13       30.    Players of COD Games also are required to abide by the Code of

14  Conduct posted at https://www.callofduty.com/values (the "Code of Conduct").

15  The Code of Conduct provides, among other things, that players must "compete

16  with integrity" when playing the COD Games against other players, and expressly

17  states that "[c]heating and griefing or other threats to fair play will not be

18  tolerated."  The Code of Conduct further states that players are responsible for how

19  their accounts are used, and that "[t]he use of cheats, including third-party

20  software, is unacceptable."  For the avoidance of any doubt, the Code of Conduct

21  provides that "engaging in any activity that grants an unfair advantage is

22  considered cheating."

23       31.    The COD Games' online multiplayer modes are made available to the

24  public through Activision's proprietary servers and matchmaking systems.  It is not

25  possible for a user to lawfully obtain access to or play the COD Games' online

26  multiplayer modes without expressly consenting to the TOU, and users only

27  maintain such access provided they are in compliance with the Code of Conduct.

28

Activision provides access to the COD Games and their multiplayer servers in reliance on players' consent to the TOU.

32.    As set forth below, Activision is informed and believes, and on that basis alleges, that Defendants are engaged in various activities related to developing, updating, marketing, distributing, selling, and supporting the COD Hacks.

**Defendant's COD Hacks and Unlawful Conduct**

The "Devware" Hack

33.    Activision is informed and believes, and on that basis alleges, that Defendant Valenzuela was the developer of a COD Hack known as "Devware" (the "Devware Hack").  Initially, the Devware Hack's most popular feature was an "unlocker" that gave users immediate, unauthorized access to in-game content in the COD Games, which normally would be earned only by playing the game or purchasing "COD Points" to be spent on such content.  By the Fall of 2022, the Devware unlocker was the most popular cheat product offered for the COD Games.

34.    By late 2022, Valenzuela had become well connected online with other COD cheat developers and sellers.  Among these individuals was A.R., who in 2022 (using the alias Noziex) operated a service called "Medieval Corp" or "Medieval Cheats," and who Activision is informed and believes, and on that basis alleges, is involved with developing cheats designed to be used with the COD Games.  Activision is further informed and believes, and on that basis alleges, that in 2023 Valenzuela and A.R. became business partners and formed a massive online community on the social media platform "Discord," comprised of tens of thousands of "members."

35.    Activision is informed and believes, and on that basis alleges, that throughout 2023 and 2024 Valenzuela continued to refine, update, and add features to the Devware Hack, chief among them a function enabling users to disrupt COD

matches and harass other COD players by, for example, kicking or "booting" other players from multiplayer games without their knowledge or consent.  In other words, by using the Devware Hack, mean-spirited players could harass others by causing them to lose their connection to the COD Games or cause their COD Games' software to crash or stop working. (Such exploits are sometimes referred to as "rage hacks" or "rage cheats").  Additionally, when players are "kicked" from a game in this manner, their COD accounts may be adversely impacted (and such players may even be penalized).

36.     By 2024, the Devware Hack had become among the most popular COD rage hacks.  As a result of the combined efforts of Valezuela and A.R., tens or hundreds of thousands of copies of the Devware Hack were downloaded by members of the public in 2023 and early 2024.  By April 2024, Valenzuela, under the moniker "Wolfy," posted on the Discord social media platform that the Devware Hack had reached over 1 million cheat "injections" into COD.  (An "injection" is the insertion of unauthorized code into an executable software file running on a user's computer.)

37.     On or about May 21, 2024, Activision sent cease-and-desist letters to Valenzuela and A.R. advising them that by developing, marketing, and distributing the Devware Hack, they had violated and were continuing to violate Activision's intellectual property rights.  The letter demanded that Valenzuela and A.R. immediately cease any further development, sale, or distribution of the Devware Hack.

38.     In response to Activision's cease-and-desist letter, Valenzuela openly mocked Activision online, posting, for example, "cant stop me and I aint stopping."  A.R. also joked online about making and selling clothing featuring the cease-and-desist letter he received from Activision. Additionally, after receiving the cease-and-desist letter, Valenzuela (using the alias "Meep") attempted to

1  rebrand Devware under the name "Stealth," and continued to sell this COD Hack

2  through a network of resellers.

3      39.    Given Valenzuela's apparent defiance, counsel for Activision called

4  Valenzuela's home.  On or around June 3, 2024, counsel spoke to Valenzuela's

5  mother regarding her son's activities.  On June 7, 2024, counsel for Activision

6  called again and spoke to an individual who claimed to be Valenzuela's brother's

7  friend.  In a separate phone call on June 7, counsel again spoke with Valenzuela's

8  mother, who claimed to have no memory of the conversation four days prior.

9  Shortly thereafter, Valenzuela shut down the Devware/Stealth Discord server and

10  also removed Devware-related domains, Discord servers, and personal accounts.

11  He also posted the following online:

12



**COMPLAINT**

40.    In reliance on Valenzuela's representations that he would comply with Activision's demands, Activision did not pursue litigation against Valenzuela in 2024.

## The Zenith COD Hack and VMP Software

41.    Activision is informed and believes, and on that basis alleges, that contrary to his representation that he would comply with Activision's demands, Valenzuela did not actually cease developing, distributing, and exploiting COD Hacks.  Instead, shortly after pretending to comply with Activision's demands, Valenzuela purported to sell the Devware Discord server to a service called "VMP Software."  In reality, VMP Software was simply a front for Valenzuela's and A.R.'s activities, and was merely a scheme to present the false appearance that they were no longer involved in the sale of the Devware Hack.

42.    In or around October 2024, Valenzuela developed and began distributing a new COD Hack known as "Zenith" (the "Zenith Hack").  Like the Devware Hack, the Zenith Hack includes "rage" features that enable users to "kick" or disconnect other players from Activision's multiplayer servers and/or to crash Activision's dedicated multiplayer servers.  Additionally, Zenith offers a variety of other features that allow players to cheat or gain unfair advantages over other players.  Such features include, without limitation, "aimbots," which cause weapons to automatically hit opponents; "ESP Bots," which identify opponent positions and allow players to see through walls or other obstacles; and an "Unlock All" feature, which instantly grants players access to all in-game cosmetics and progression items in lieu of purchasing them or earning them through gameplay.

43.    The Zenith Hack, like the Devware Hack before it, also includes or is bundled with a Hardware ID (HWID) Spoofer.  HWID Spoofers are used to mask or change hardware identifiers such as the motherboard serial number, GPU ID, or CPU ID in a player's machine. The purpose of the HWID Spoofers is two-fold. First, HWID Spoofers are designed to circumvent hardware "bans" (i.e. loss of

access to the game servers) placed by Activision against players who have undertaken particularly malicious conduct—thereby allowing players whose access to COD Game Servers have been restricted to regain access to the COD Game Servers without Activision's permission or authorization.  Second, HWID Spoofers are used by players using cheating software to hide their hardware credentials so that they can avoid losing access to the COD Game Servers if their activities are detected.

44.    Activision is informed and believes, and on that basis alleges, that in 2024 A.R. began selling and distributing Zenith under the alias "Brother Bytel" via a storefront called "Aparta Bytes." Aparta Bytes quickly became the primary distribution outlet for Zenith.  Meanwhile, Valenzuela (operating in the shadows) continued to sell and distribute Zenith through multiple websites associated with VMP Software located at https://vmp.software/ and https://vmp-software.gitbook.io/vmp-software, as well as a private Discord server called Zenith, which only verified resellers (including A.R., operating as "Bytel") were permitted to join.

45.    Activision is informed and believes, and on that basis alleges, that in order to further expand the reach of their Zenith Hack and to increase their revenue from the Zenith Hack, Valenzuela and A.R. partnered with numerous COD Hack "resellers," including without limitation Doe 1 a/k/a CesarRodregaz.  On information and belief, these resellers purchased from A.R. and/or Valenzuela "bulk" licenses for the Zenith Hack, and then sold and distributed the Zenith Hack via their personal online websites or e-commerce portals.

46.    In March 2025, Activision sent another cease-and-desist letter to Valenzuela demanding that he cease any further development or distribution of the Zenith Hack, or any other COD cheating or hacking software.  In response to Activision's March 2025 letter, Valenzuela posted the following message online: "I have recently received a cease and desist (C&D) notice and, as a result, will no

longer be providing any services related to Activision Publishing.  While this was not an easy decision, I must comply with the legal request and discontinue any associated projects or support."

Defendants' Continued Defiance

47.     Activision is informed and believes, and on that basis alleges, that notwithstanding this second representation, Valenzuela still had no intention of complying with Activision's request.  Instead, Valenzuela continued to operate and sell the Zenith Hack, with no discernible change in his activities in the months following March 2025.  Additionally, in May 2025 and July 2025, Valenzuela used Zenith to commit two high-profile cyber-attacks which caused the multiplayer servers for *Call of Duty: Black Ops 6* and *Call of Duty: Modern Warfare III* to crash.

48.     On or about November 3, 2025, Activision sent yet another cease-and-desist letter to Valenzuela.  Valenzuela did not respond to that letter, and did not take any steps to stop selling the Zenith Hack.  Instead, he announced to the public that "I AM BACK"– indicating that he intended to continue his infringing conduct.

49.     As of the present time, Valenzuela and A.R. continue to actively sell Zenith.  In fact, they have built a network of 100 active direct and indirect resellers.  Activision is informed and believes, and on that basis alleges, that neither Valenzuela nor A.R. intends (and never have intended) to refrain from developing and distributing COD Hacks.  Accordingly, it became clear that Valenzuela and A.R. were unwilling to cooperate with Activision's informal demands and that it had no other choice but to file this lawsuit.

**Defendants' Unlawful Activities**

50.     Activision is informed and believes, and on that basis alleges, that through their conduct, Defendants have violated and continue to violate Activision's rights in several respects.

51.     First, in order for any of the COD Hacks to operate with the COD

17

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

21237906.5

1  Games, such software necessarily includes technology that primarily is designed to

2  avoid, bypass, evade, or otherwise circumvent Activision's anti-cheat and access

3  control technologies.  Additionally, the COD Hacks' "unlocker" features

4  circumvent and disable technology implemented by Activision to prevent players

5  from gaining access to "locked" content until they have earned or purchased such

6  access.  Defendants advertise and promote their COD Hacks as effectively

7  circumventing Activision's anti-cheat and access control software.  Accordingly,

8  each time Defendants distribute or sell a license to any of the COD Hacks, they are

9  trafficking in technology that controls access to the COD Games, the COD Games'

10  content, and the dynamic multiplayer COD experience created when players

11  connect to Activision's multiplayer servers.

12      52.     Second, Defendants' COD Hacks contain HWID Spoofers, which are

13  designed to allow players who have been subject to hardware ID bans to access

14  Activision's proprietary video game servers after their access has been revoked.

15  By enabling such conduct, Defendants are engaged in aiding and abetting

16  violations of the Computer Fraud and Abuse Act, 18 U.S.C. §1030.

17      53.     Third, each time players use a COD Hack, they violate Activision's

18  TOU, including those provisions that specifically prohibit players from "us[ing],

19  develop[ing], host[ing] or distribut[ing] cheats, automation software (bots),

20  modded lobbies, hacks, mods or any other unauthorized third-party software" in

21  connection with Activision's games "or engag[ing] in any form of cheating,

22  boosting, or booting." Accordingly, Activision is informed and believes, and on

23  that basis alleges, that as a result of Defendants' conduct, hundreds or thousands of

24  breaches of these contracts have occurred.

25      54.     Activision is informed and believes, and on that basis alleges, that

26  Defendants are fully aware that the use of the COD Hacks violates the TOU. In

27  fact, the COD Hacks have no purpose or function other than to enable players to

28  gain unauthorized access to Activision's servers and violate the TOU by using

Mitchell
Silberberg &
Knupp LLP
21237906.5

18
**COMPLAINT**

cheats and exploits.  Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Activision (*i.e.*, access to the COD Games and their multiplayer experience) while they simultaneously engage in continuing breaches of their obligations under these contracts.

55.     By their conduct, Defendants have caused and are continuing to cause serious harm to the COD Games and to Activision.  By way of example, Defendants irreparably harm the ability of Activision's legitimate customers to enjoy and participate in the online experiences carefully created by Activision.  As a result, Activision has suffered, and continues to suffer, loss of player revenues.  Additionally, Defendants' knowing and willful misconduct has forced Activision to expend substantial resources attempting to remediate the damage caused by the COD Hacks.  This includes creating and releasing updates to the COD Games that counteract the COD Hacks, responding to player complaints, employing personnel to police the games to detect the use of the COD Hacks, and "banning" users who are using the COD Hacks.

56.     Defendants' conduct has resulted in damage to Activision in an amount to be proven at trial.  By Activision's estimation, such damage may amount to millions of dollars.

57.     Unless and until Defendants are preliminarily or permanently enjoined, Activision will continue to suffer severe harm from the COD Hacks.

## COUNT I

## Trafficking In Circumvention Devices

58.     Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 57, as if set forth fully herein.

59.     The COD Games are copyrighted works.  Activision's copyrights in the COD Games extends to, but is not limited to, the COD Games' source code, the audiovisual elements perceived by players when the Games are executed on

players' personal computers, and the game experience and virtual world created when players connect their software client to Activision's multiplayer servers to play the COD Games' online modes.

60.    Activision has incorporated into the COD Games technological measures that effectively control access to the COD Games, including access to the dynamic audiovisual elements that comprise the game and to content contained in the COD Games for which access is restricted to players that have unlocked such content through legitimate means.

61.    The COD Hacks are comprised of or contain technologies, products, services, devices, components, or parts thereof that primarily are designed or produced for the purpose of circumventing technological measures that effectively control access to the COD Games and their content.

62.    The COD Hacks (and the portions thereof that circumvent Activision's anti-cheat technologies) have no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work and that protects the exclusive rights of a copyright owner.

63.    Defendants market the COD Hacks in the United States with knowledge of their use to circumvent Activision's technological access controls.

64.    As a result of the foregoing, Defendants are offering to the public, providing, importing, or otherwise trafficking in technology that violates 17 U.S.C. § 1201(a)(2).

65.    Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Activision.

66.    Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

67.     Defendants' conduct has caused damage to Activision and has unjustly enriched Defendants, in an amount to be proven at trial.

68.     As a result of Defendants' acts and conduct, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Activision is informed and believes, and on that basis alleges, that, unless enjoined and restrained by this Court, Defendants will continue to violate Section 1201 of the DMCA.  Activision is entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

69.     As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Activision is entitled to Defendants' profits attributable to their violations of 17 U.S.C § 1201.

70.     Alternatively, Activision is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each violation by Defendants.

71.     Activision further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).

## COUNT II

## Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

72.     Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 71, as if set forth fully herein.

73.     Activision's COD Game Servers are computer servers used by Activision to engage in interstate and foreign commerce.  The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

74.     By developing, marketing, distributing, and encouraging the use of the COD Hacks, several of which contain HWID Spoofers designed to allow players who have been subject to hardware ID bans to access the Game Servers, Defendants have knowingly aided and abetted, conspired with, or otherwise caused

Mitchell Silberberg & Knupp LLP
21237906.5

players of the COD Games to (a) intentionally access the Game Servers without Activision's authorization and/or (b) knowingly cause the transmission of a program, information, code, or command in order to intentionally cause damage to the Game Servers.

75.     As a result of Defendants' conduct, Activision has suffered damages in excess of the $5,000 statutory minimum.  Activision has been damaged by Defendants' actions, including in the form of decreased participation by players in the Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization.

76.     Activision has also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to their customers' goodwill and trust.

77.     On information and belief, Defendants have continued to conspire to obtain unauthorized access to or to damage the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

## COUNT III

## <u>Intentional Interference With Contractual Relations</u>

78.     Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 77, as if set forth fully herein.

79.     As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU.  In addition to the TOU, licensed users also are required to comply with the Code of Conduct, in particular as relates to cheating and any other activities that grant an unfair advantage.

80.     Activision's contracts with its users are valid and enforceable.

81.     Each time a purchaser of the COD Hacks uses a COD Hack in connection with the COD Games, he or she breaches the TOU and the Code of

1    Conduct.  Activision is informed and believes, and on that basis alleges, that

2    thousands of such breaches have taken place by Defendants' customers.

3        82.    Activision is informed and believes, and on that basis alleges, that

4    Defendants are aware of both the existence and specific relevant terms of contracts

5    between Activision and its users in the United States, including the TOU and Code

6    of Conduct.  Specifically, Defendants are aware that the TOU and Code of

7    Conduct prohibit players from using the COD Hacks and that players are at risk of

8    being banned from the COD Games should they be caught using the COD Hacks.

9    Nevertheless, Defendants intentionally encourage and induce users of the COD

10   Games to purchase and use the COD Hacks, knowing that the use of these products

11   by their customers is a breach of these customers' contracts with Activision.

12       83.    By inducing Activision's users to breach their contracts with

13   Activision, Defendants have intentionally interfered, and continue to interfere, with

14   the contracts between Activision and its users.

15       84.    As a direct and proximate result of Defendants' actions, Activision

16   has suffered damages in an amount to be proven at trial, including but not limited

17   to a loss of goodwill among users of Activision's games, diversion of Activision's

18   resources to attempt to detect and prevent the use of the COD Hacks, decreased

19   profits, and a loss of profits from users whose accounts Activision has terminated

20   for violation of the TOU and Code of Conduct in the United States.

21       85.    As a further result of Defendants' actions, Defendants have unjustly

22   obtained specifically identifiable property, consisting of all of the proceeds

23   attributable to the sale of the COD Hacks in the United States, and any other

24   products or services that violate any of Activision's rights, and any additional

25   property traceable to those proceeds.  Those proceeds, which are directly

26   attributable to Defendants' manipulation and misuse of the COD Games and

27   intentional interference with Activision's contracts, rightfully and equitably belong

28   to Activision.

86.    Defendants' intentional interference with the contracts between Activision and its licensed users in the United States entitles Activision to injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

87.    Defendants are guilty of oppression, fraud, or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

**COUNT IV**

**<u>Unfair Competition</u>**

88.    Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 87, as if set forth fully herein.

89.    The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

90.    As a direct and proximate result of Defendants' unfair competition in the United States, Activision has been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate. Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Activision, and an order that Defendants convey to Activision the gross receipts received or to be received that are attributable to the sale of the COD Hacks in the United States.

91.    Defendants are guilty of oppression, fraud or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

92.    As a result of Defendants' acts and conduct in the United States, Activision has sustained and will continue to sustain substantial, immediate, and

Mitchell
Silberberg &
Knupp LLP

21237906.5

1  irreparable injury, for which there is no adequate remedy at law. Activision is

2  informed and believes, and on that basis alleges, that unless enjoined and

3  restrained by this Court, Defendants will continue to engage in unfair competition.

4  Pursuant to California Business & Professions Code § 17203, Activision is entitled

5  to temporary, preliminary, and permanent injunctions prohibiting further acts of

6  unfair competition.

7  ## **PRAYER FOR RELIEF**

8        WHEREFORE, Activision prays that this Court enter judgment in its favor

9  on each and every claim for relief set forth above and award it relief, including but

10  not limited to an order:

11        1.      Preliminarily and permanently enjoining Defendants, their officers,

12  employees, agents, subsidiaries, representatives, distributors, dealers, members,

13  affiliates, and all persons acting in concert or participation with Defendants from:

14  (i) trafficking in circumvention devices in the United States; (ii) improperly

15  accessing or damaging Activision's protected servers without authorization; (iii)

16  intentionally interfering with Activision's or its affiliates' contracts with players in

17  the United States; and (iv) engaging in unfair competition in the United States.

18        2.      Requiring Defendants to shut down the COD Hacks, any forthcoming

19  software that allows players to cheat in any game published by Activision or its

20  affiliates, and any colorable copies thereof, hosted at any domain, address,

21  location, or ISP.

22        3.      Requiring Defendants to deliver to Activision for impoundment or

23  destruction all copies of materials that infringe or violate any of Activision's rights,

24  as described herein, including, without limitation, the source code for the COD

25  Hacks.

26        4.      Requiring Defendants to provide Activision with an accounting of any

27  and all sales of products or services in the United States that infringe or violate any

28  of Activision's or affiliates' rights, as described herein.

Mitchell
Silberberg &
Knupp LLP

21237906.5

**COMPLAINT**

1    5.    Awarding Activision actual or maximum statutory damages for

2  violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. §

3  1203(c).

4    6.    Awarding Activision exemplary and punitive damages against

5  Defendants on Activision's cause of action for intentional interference with

6  contractual relations.

7    7.    Awarding Activision restitution of Defendants' unlawful proceeds,

8  including an accounting of any and all sales of the COD Hacks in the United

9  States, and/or any other products or services that violate any of Activision's rights

10 described herein.

11    8.    Imposing a constructive trust over the proceeds unjustly obtained by

12 Defendants through the sales of the COD Hacks in the United States, and/or any

13 other products or services that violate any of Activision's rights described herein.

14    9.    Awarding such other and further relief as this Court may deem just

15 and appropriate.

16

17 DATED: FEBRUARY 6, 2026    MARC E. MAYER
                              MARK C. HUMPHREY
18                            HANNAH G. SHEPHERD
                              MITCHELL SILBERBERG & KNUPP LLP
19

20

21                            By:    _/s/ Marc E. Mayer_____
                                     Marc E. Mayer
22                                   Mark C. Humphrey
                                     Hannah G. Shepherd
23                                   Attorneys for Plaintiff
                                     Activision Publishing, Inc.
24

25

26

27

28

1

## <u>JURY DEMAND</u>

2

Activision Publishing, Inc. demands a trial by jury on all issues so triable.

3
4
5

DATED: FEBRUARY 6, 2026        MARC E. MAYER
                               MARK C. HUMPHREY
                               HANNAH G. SHEPHERD
                               MITCHELL SILBERBERG & KNUPP LLP

6
7
8
9

By:    */s/ Marc E. Mayer*
       Marc E. Mayer
       Mark C. Humphrey
       Hannah G. Shepherd
       Attorneys for Plaintiff
       Activision Publishing, Inc.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28